IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*v.*<br>SHAMARRI TACHE BROOKS<br>a.k.a. "Juney Knottz" | Criminal Action No.<br>1:25-cr-549-01-VMC |

**Response to Defendant's Sentencing Memorandum**

The United States of America, by Theodore S. Hertzberg, United States Attorney, and Jessica C. Morris, Assistant United States Attorney for the Northern District of Georgia, files this Response to Defendant's Sentencing Memorandum.

1. **The PSR properly calculated intended loss based on the face value of the stolen and fraudulent checks Brooks possessed.**

Brooks concedes that the face value of counterfeit or stolen checks may be appropriately used as the basis of intended loss calculations but argues that the Court should only count as intended loss the face value of the subset of checks that he or his co-defendant attempted to negotiate through ATM deposits. (Doc. 52 at 6). Brooks possessed thousands of additional stolen checks, however. When Brooks was arrested by the Dunwoody Police Department in January 2024, law enforcement recovered 1,494 stolen checks with a combined face value of $2,640,215.21. (PSR ¶ 37). Two years later, in January 2026, federal law enforcement arrested Brooks in connection with the instant case and seized 681

more checks from his residence, with a combined face value of $2,604,183.17. (PSR ¶ 73). Brooks argues that the face value of these checks should not be aggregated as intended loss, along with the images of the stolen checks he sold to law enforcement in sting operations.

As a foundational matter, Brooks' low success rate when negotiating stolen checks does not help his argument. The classification of these check values as "intended loss"—irrespective of the likely success of the scheme—is consistent with the Guidelines. Indeed, "intended loss" encompasses loss includes "intended pecuniary harm that would have been *impossible or unlikely to occur* (e.g. as in a government sting operation or an insurance fraud in which the claim exceeded the insured value)." USSG § 2B1.1(b)(1) cmt. (emphasis added).

In the context of counterfeiting schemes, the controlling Eleventh Circuit authority, *United States v. Grant,* instructs that "[w]here the Government presents evidence indicating the defendant intended to utilize the full face value of the checks, and the defendant fails to present countervailing evidence, a district court is especially justified in including the checks' full face value in its intended loss calculation." 431 F.3d 760, 765 (11th Cir. 2005); *see also United States v. Santos*, 527 F.3d 1003, 1009 (9th Cir. 2008)(following *Grant* and holding "absent countervailing evidence. . .a district court may reasonably infer, for the purposes of calculating intended loss under U.S.S.G. § 2B1.1(b)(1), that a participant in a counterfeiting scheme intends to take up to the full face amount of the stolen checks on which the counterfeit checks are based").

Brooks emphasizes that the most recent substantive back fraud count charged an ATM deposit on or about August 30, 2024, over a year before his federal indictment in December 2025. (Doc. 52 at 8-9). He suggests that this passage of time creates an inference that he had moved away from the fraudulent negotiation of stolen checks to focus exclusively on trafficking in stolen checks. This would be an incorrect inference. During the federal search warrant at Brooks' residence on January 6, 2026, agents seized multiple ATM receipts reflecting recent deposits, at least one of which was paired with an ATM card in the name of depository account holder. The ATM deposit receipts, which are attached as Exhibit 1 and summarized in the chart below, reflect ATM deposits of large checks in the month leading up to Brooks' arrest.[1]

| ***ATM Deposit Receipts Seized at Brooks' Residence on 1/6/2026*** | | | | |
|---|---|---|---|---|
| | **Date** | **Check Value** | **Bank** | **ATM Location** |
| 1 | 12/30/2025 | $8,938.00 | Chase | Buford, Ga. |
| 2 | 12/30/2025 | $84,441.64 | BOA | Buford, Ga. |
| 3 | 12/29/2025 | $22,404.00 | Truist | Sewanee, Ga. |
| 4 | 12/9/2025 | $4,776.57 | Chase | Conyers, Ga. |
| 5 | 12/9/2024 | $4,090.00 | PNC | Decatur, Ga. |

[1] Receipts 1 and 2 were in a blue backpack in the living room area, described as Item 11; Receipt 3 was in a box on the floor of the living room and marked as Item 41; and Receipts 4 and 5 were found on the floor of a bedroom, and marked as Item 67.

The affidavit in support of the residential search warrant also referenced a video posted to Brooks' Instagram account on November 19, 2025, depicting Brooks and his co-defendant in the kitchen area of Brooks' house appearing to print checks next to a stack of cash. (*See* Search Warrant Aff. at 33 at 13-15, attached as Exh. 2). This evidence, along with the seizure of additional bank cards and the equipment he used to scan, alter and print checks, establishes by a preponderance that he possessed the stolen checks for the purpose of negotiating them. As such, the face value of the checks is an appropriate measure of intended loss.

The Government agrees that Brooks' scheme involved both the trafficking of stolen checks and the negotiation of stolen, altered checks. (Doc. 52 at 8). Whether Brooks was trafficking in stolen checks or accumulating them for future negotiation, in both instances, the face value of the financial instruments is properly used for calculating intended loss. Even when he is selling a stolen check, rather than negotiating it himself, his intent was to aid and abet the commission of bank fraud by his customer. The Government is not required to present check-by-check evidence in a scheme of this nature and magnitude.

In arriving at the intended loss, "the court need only make a reasonable estimate of the loss." USSG § 2B1.1 cmt. n. 3(B). Here, the constellation of evidence described above supports the Court's finding, by preponderance, that the face value of the checks was the intended loss amount and that such pecuniary harm was reasonably foreseeable to him. USSG § 2B1.1(b)(1)(C)(iv).

**2. The firearm enhancement is properly applied.**

When law enforcement searched Brooks' houses on January 23, 2024 and January 8, 2026, they seized multiple firearms. *See* PSR ¶¶ 36 and 75. In addition to seizing the firearms, they seized stolen checks, along with computers and printers involved in the Defendant's check forgery scheme, among other items. During the search on January 8, 2026, the firearms were in the kitchen cabinet, the same area of the house as the printer—with recently stolen checks on the scanner glass—and the shoebox containing stolen checks. PSR ¶¶ 72, 75.

A two-level enhancement should be applied pursuant to USSG § 2B1.1(b)(16)(B) because the Defendant possessed these firearms "in connection with" the offense. The "in connection with" language has been expansively interpreted in § 2K2.1(b)(7)(B), an analogous guideline providing a four-level enhancement for use or possession of a "firearm or ammunition in connection with another felony offense." *See United States v. Brooks,* 112 F.4th 937, 949 (11th Cir. 2024)(explaining expansive nature of "in connection with" language). "A defendant can possess a firearm 'in connection with' another felony offense if the firearm 'potentially embolden[s]' or has the potential of facilitating the other felony offense." *Id*. In *United States v. Rhind*, 289 F.3d 690, 695 (11th Cir. 2002), the Eleventh Circuit upheld the four-level enhancement under 2K2.1 for the defendant's unlawful possession of an unloaded shotgun in the trunk of a vehicle in connection with the offense of possessing and concealing counterfeit money. The Court noted that "it would be reasonable to conclude that the presence of the firearms protected the counterfeit money from theft during the execution of the felony [i.e. the counterfeiting offense]." *Id*. The same is true here,

the Defendant's possession of loaded firearms is reasonably construed as being in connection with the protection of the contraband and proceeds associated with his check forgery scheme.

**3. The Court should not downward vary based on the impact of the victim enhancement where the two-level enhancement for number of victims is a straightforward application of the Guidelines, especially that considering Brooks possessed thousands of stolen checks belonging to different account holders.**

Brooks did not object to the PSR's application of a two-level increase, pursuant to USSG § 2B1.1(b)(2)(A)(i), for an offense involving 10 or more victims. (PSR ¶ 86). In his Sentencing Memorandum, however, he contends that this enhancement "inflates the advisory range based on theoretical harm to individuals who were never actually harmed." (Doc. 52 at 18). Brooks suggests that victims who sustain actual pecuniary loss comport with the "ordinary" meaning of victim, whereas victims whose checks have been stolen are in a different class. (*Id*. at 17-18). The commentary to the Guidelines makes plain, for the purpose of victim counting in cases involving means of identification, that the term "victim" includes "any individual whose means of identification was used unlawfully or without authority." § 2B2.1 cmt. n.4(E). Here, Brooks possessed thousands of stolen checks, including the names, account numbers, and routing codes of accountholders, which qualify as "means of identification". *See* 18 U.S.C. § 1028(d)(7)(defining "means of identification"). Given there were exponentially more victims than required to trigger the two-level enhancement, the Court should not take seriously the claim that this enhancement was somehow heavy handed.

5. **The Court should also reject Brooks' request for a variance based on alleged unwarranted sentencing disparities where his scheme involved training others to commit fraud and where his scheme exploited his fanbase and popularity to normalize criminal activity.**

Brooks lists other fraud cases in this district including substantial losses where the defendants received sentences well below the advisory Guideline range in this case. (Doc. 52 at 20-22). According to Brooks, some of these other defendants also had a track record of fraud or other criminal history. He focuses on the quantum of actual loss and sophistication of the schemes.

Brooks' situation is distinguishable in many ways from these other fraud offenders. His scheme poses a unique threat to the public—not because of its sophistication—but because his brazenness and his influence normalize and popularizes criminal behavior that undermined the integrity of our institutions and hurt thousands of victims. Brooks did not merely commit fraud himself, his business model involved training others to commit fraud and selling products or "methods" to commit fraud along with stolen checks. As mentioned in the PSR, Brooks is a recording artist with a substantial fanbase and has a merchandising company, which clothing and accessories with the "No Free Sauce" brand. PSR ¶¶ 145-147. In his music, he promoted fraud as a lifestyle. For example, when the undercover agent negotiated over Telegram to purchase Brooks' fraud instructional manual, i.e. the "Sauce Book, Brooks also included a music video with the file name "Madoff-June Knottz" in which he likens himself to the Bernie

Madoff. The video shows Brooks vising an ATM in an NFS baclava, posing with stacks of cash, and displays guns on the counter with checks.[2] His branded gear similarly promoted fraud as a lifestyle. The following is an example of merchandise offered through his website, which includes a t-shirt stating,




“NOTHING PERSONAL” “WE CASH BIG CHECKS” “NO FREE SAUCE.”

Because his business model involved, in part, selling stolen checks and teaching others to commit fraud, it is impossible to quantify the impact of his conduct, which spanned multiple years. Since the finalization of the PSR, the Government did receive a victim impact statement from one individual whose

---

[2] The government will present additional screen captures of the music video at the sentencing hearing, including images of the firearms with the checks insofar as it is relevant to the firearm enhancement.

business was impact by Brooks' scheme. Asked about the impact on the business of the check fraud, the representative noted, "We closed several bank accounts, opened new ones, contacted all vendors & contacted our clients. This created several hours of unexpected work. Exceeded 100 hours." Asked whether the crime impacted the company's business practices, the representative wrote, "Yes. Converted most accounts payable to ACH. The post office and security is poor." This disruption and distrust is representative of the harm caused by Brooks' scheme.

In considering the Section 3553 factors and distinguishing Brooks from the other cases he mentioned, the persistence and breadth of fraud and criminal activity is noteworthy. Others may have had criminal history, but Brooks was arrested by Dunwoody Police Department in January 2024, spent several months in jail, received a felony conviction, and resumed the criminal scheme immediately. When he was arrested in January 2026, he was living in a house rented in the identity of A.D., a real person in South Carolina. He had not one, but two firearms in his house, despite being a convicted felon and on felony probation with the State.

The Guidelines calculations in the Final PSR result in a range of 145 to 175 months, 24 months of which is a mandatory sentence resulting from the aggravated identity theft conviction. (PSR, Part D). In the parties' plea agreement, the Government agreed to move for a two-level downward variance from the Guidelines range determined by the Court and promised to advocate for the low-end of that adjusted range, barring conduct from Brooks inconsistent

with acceptance of responsibility. A two-level variance results in a total range of 121 to 145. A sentence at the low-end of the is range, i.e. 121 months accomplishes the goals of sentencing. The Government acknowledges that this is a substantial sentence and contends that it is fully supported by the Section 3553 factors, as will be addressed more fully in argument.

**Conclusion**

For the reasons discussed here and those that will be presented at the sentencing hearing, the Government respectfully urges the Court to adopt the findings and Guidelines calculations in the Final PSR and reject Brooks' request for a variance down to 60 months.

Respectfully submitted,

THEODORE S. HERTZBERG
*United States Attorney*

/s/JESSICA MORRIS
*Assistant United States Attorney*
Georgia Bar No. 100907
Jessica.Morris3@usdoj.gov
600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000 fax (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

David A. O'Neal

August 26, 2026

/s/ JESSICA MORRIS
*Assistant United States Attorney*